## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

SPEECH FIRST, INC.

*Plaintiff,*

v.

PAMELA WHITTEN, in her official capacity as President of Indiana University; LAMAR R. HYLTON, in his official capacity as Vice Provost for Student Life for Indiana University Bloomington; KATHY ADAMS RIESTER, in her official capacity as Associate Vice Provost for Student Life and Dean of Students for Indiana University Bloomington; CEDRIC HARRIS, in his official capacity as Assistant Dean for Student Support and Bias Education for Indiana University Bloomington; JASON SPRATT, in his official capacity as Associate Vice Chancellor and Dean of Students for Indiana University Indianapolis; HEATHER BRAKE, in her official capacity as Associate Dean of Students for Student Conduct and Advocacy for Indiana University Indianapolis; KATHERINE BETTS, in her official capacity as Assistant Vice Chancellor of Diversity, Equity, and Inclusion at Indiana University Indianapolis; W. QUINN BUCKNER; CINDY LUCCHESE; CATHY LANGHAM; JEREMY A. MORRIS; J. TIMOTHY MORRIS; KYLE S. SEIBERT; DONNA B. SPEARS; ISAAC TORRES; and VIVIAN WINSTON, all in their official capacities as members of the Indiana University Board of Trustees,

*Defendants.*

Case No. _____

**VERIFIED COMPLAINT**

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

## INTRODUCTION

1.　"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.　Yet Indiana University and its officials have enacted a far-reaching policy that is designed solely to deter, discourage, and otherwise "prevent" students from expressing disfavored views about the political and social issues of the day.

3.　The University's bias incidents policy martials the authority of university administrators to police speech that someone believes is motivated by "bias." The University formally defines a "bias incident" as "any conduct, speech, or expression, motivated in whole or in part by bias or prejudice meant to intimidate, demean, mock, degrade, marginalize, or threaten individuals or groups based on that individual or group's actual or perceived identities." Bias incidents can occur on or off campus, including on social media, and the University tracks and logs them all. Students accused of "bias incidents" can be referred for formal disciplinary proceedings. This policy poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague,

overbroad, and viewpoint-based definition of "bias incident" that triggers them—violate the First and Fourteenth Amendments.

4. Speech First has members who attend Indiana and whose protected speech is chilled by the bias incidents policy. The policy should be declared unconstitutional and enjoined.

## JURISDICTION AND VENUE

5. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

6. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

7. Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

8. Plaintiff, Speech First, is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. *E.g.*, *Speech First, Inc. v. Khator*, 2022 WL 1638773 (S.D. Tex. May 19, 2022); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

9. Speech First has members who attend Indiana University, including Students A, B, C, D, and E.

10. Indiana University is a public university organized and existing under the laws of Indiana.

11.     Defendant Pamela Whitten is President of Indiana University. Whitten is responsible for the enactment and enforcement of University policies, including the bias incidents policy. Whitten is sued in her official capacity.

12.     Defendant Lamar R. Hylton is Vice President for Student Life for Indiana University Bloomington. Hylton is responsible for oversight and enforcement of University policies at IU Bloomington, including the bias incidents policy. Hylton is sued in his official capacity.

13.     Defendant Kathy Adams Riester is Associate Vice President for Student Life and Dean of Students at Indiana University Bloomington. Adams Riester is responsible for nearly all aspects of student life at IU Bloomington, including enforcement of the bias incidents policy. Adams Riester is sued in her official capacity.

14.     Defendant Cedric Harris is Associate Dean of Student Support and Bias Education. Harris enforces the bias incidents policy at Indiana University Bloomington by, among other things, tracking, logging, and responding to all bias incident complaints at IU Bloomington. Harris is sued in his official capacity.

15.     Defendant Jason Spratt is Associate Vice Chancellor and Dean of Students for Indiana University Indianapolis. Spratt is responsible for nearly all aspects of student life at IU Indianapolis, including enforcement of the bias incidents policy. Spratt is sued in his official capacity.

16.     Defendant Heather Brake is the Associate Dean of Students for Student Conduct and Advocacy for Indiana University Indianapolis. Brake is responsible for oversight and

enforcement of the University's policies at IU Indianapolis, including the bias incidents policy. Brake is sued in her official capacity.

17.     Defendant Katherine Betts is Assistant Vice Chancellor of Diversity, Equity, and Inclusion at Indiana University Indianapolis. Betts enforces the bias incidents policy at IU Indianapolis by, among other things, tracking, logging, and responding to all bias incident reports at the University. Betts is sued in her official capacity.

18.     Defendants W. Quinn Buckner, Cindy Lucchese, Cathy Langham, Jeremy A. Morris, J. Timothy Morris, Kyle S. Seibert, Donna B. Spears, Isaac Torres, and Vivian Winston are members of the Indiana University Board of Trustees. The Board of Trustees is the "University's governing board, its legal owner, and its final authority." The Board is thus responsible for management and oversight of all aspects of the University, including the bias incidents policy. The Board Defendants are all sued in their official capacities.

## BACKGROUND

## I.     College Students and Their First Amendment Rights

19.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

20.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its

- 5 -

surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

21.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

22.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Fenves*, 979 F.3d at 339.

## II. Universities' Use of Bias Response Teams to Chill Speech

23.     Instead of promoting the "robust exchange of ideas," *Keyishian*, 385 U.S. at 603, universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

24.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights and Expression (FIRE), are "university regulations prohibiting expression that would be constitutionally protected in society at large." *Spotlight on Speech Codes 2022* at 9, FIRE, perma.cc/4P23-HJWV.

25.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies impose vague, overbroad, content-based (and often viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 9; *see Fenves*, 979 F.3d at 338-39 n.17 (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

26.     Because express speech codes fare poorly in court, universities are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams." *See Free Speech in the Crosshairs: Bias Reporting on College Campuses*, Speech First (2022), perma.cc/DX37-LX3F (reporting that the number of bias response teams at American universities nationwide has doubled in less than five years).

27.     Living up to their Orwellian name, bias response teams encourage students to monitor each other's speech and report incidents of "bias" to the University (often

anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

28.    Students have been reported to bias response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, perma.cc/84NZ-SM2E.

29.    After receiving reports of a bias incident, bias response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

30.    Although universities claim this process is entirely voluntary, they know students do not see it that way. As the Sixth Circuit has explained, an "invitation from [a bias response team] to meet could carry an implicit threat of consequence should a student decline the invitation." *Schlissel*, 939 F.3d at 765. Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background." *Id.*

31.    A 2017 report from FIRE found that bias-response teams monitor protected expression and lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Bias Response Team Report 2017*, at 28. "[T]he posture taken by many Bias Response Teams," the study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

32.     Other universities have discovered that bias response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias response team, citing their "high failure rate" and their tendency to "become almost punitive."

33.     University professors have similarly observed that bias response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), perma.cc/CS56-LQ7B; *see also* Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466 (2019) ("[E]fforts [by bias response teams] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas are likely to subvert free and open inquiry and invite fears of political favoritism.").

34.     Courts have likewise recognized the chilling effect of bias response teams that closely resemble Indiana's. After Speech First challenged similar bias response teams at the University of Texas, the University of Michigan, and the University of Central Florida, all three schools disbanded their teams. The Sixth Circuit held that Michigan's team imposed an "objective chill" on speech because it "act[ed] by way of implicit threat of punishment and intimidation to quell speech." *Schlissel*, 939 F.3d at 765. The Fifth Circuit agreed, stressing that

Texas's team "represent[ed] the clenched fist in the velvet glove of student speech regulation." *Fenves*, 979 F.3d at 338. The Eleventh Circuit likewise held that "the average college-aged student would be intimidated—and thereby chilled from exercising her free-speech rights—by subjection to [Central Florida's] bias-related-incidents policy." *Cartwright*, 32 F.4th at 1124.

35.    Unsurprisingly, the rise of bias response teams and speech codes is matched by a parallel rise in the percentage of college students who feel like they cannot express controversial opinions on campus. According to a September 2020 survey of more than 20,000 American college students, an astonishing 42 percent of students believe their university would punish them for making an offensive or controversial statement. *2020 College Free Speech Rankings*, at 19, FIRE (Sept. 2020), perma.cc/TSJ6-HRE7. A separate survey found that, among non-freshman college students, nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are offensive to some people," had become "more difficult" in the Fall 2020 semester than in previous semesters. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), perma.cc/6RZA-SUE9.

36.    Indiana is no exception. A 2022 campus climate survey at IU Indianapolis found that 61% of conservative undergraduates "fear speaking up for what [they] think." Jacob Stewart, *IUPUI's Future Plan Promotes DEI Initiatives, Ignores Student Concerns on Free Expression*, Campus Reform (July 10, 2023), perma.cc/C2M8-UQXP.

### III.    The University's Bias Incidents Policy

37.    The University has adopted a "bias incidents" policy designed to deter, suppress, and punish disfavored and controversial speech.

38. The University defines a "bias incident" as "any conduct, speech, or expression, motivated in whole or in part by bias or prejudice meant to intimidate, demean, mock, degrade, marginalize, or threaten individuals or groups based on that individual or group's actual or perceived identities."

39. The precise contours of what the policy forbids and what it permits are unclear—and the University's circular description of a "bias incident" as "any" incident "motivated … by bias" provides little guidance. One aspect of the policy is unambiguous, however: it plainly encompasses pure speech. Students can be reported for, among other things, an offensive "Email or Text Message" or "Phone Call," a "Written" comment motivated by bias, and "Verbal" offenses. Bias incidents can occur on or off campus, including on "social media" or "other digital source[s]."

40. The University vigorously promotes the bias incidents policy and "urges anyone who has experienced or witnessed a bias incident to report it." Bias incident complaints can be submitted online via a "Bias Incident Report" form on the University's website, by emailing an administrator directly, or through a cell phone app created by the University. The main webpage for the IU Indianapolis Office of Student Conduct lists the University's "Bias Incident Report" form directly between forms for reporting "harassment, discrimination, or sexual misconduct," "personal misconduct," and "academic misconduct."

41. Importantly, complaints about biased speech can be submitted anonymously. Indeed, the University emphasizes the option of anonymity when encouraging students to report their peers. A University webpage providing "campus resources [and] contacts" for

"bias incident reporting" provides a link to the complaint form with the tagline: "All you have to do is complete a form—and it's anonymous."

42.     When reporting biased speech, complainants specify the date and location of the alleged incident and list key details about the "involved parties," including the offender's name, University ID, and email address. Complainants are also required to provide a description of the incident—where they are directed to "place … language in quotes so [IU] know[s] that it is part of the incident"—and include "supporting documentation" for the complaint, such as "[p]hotos, video [and] email[s]." Complainants further specify whether they "directly experienced the bias," are "supporting individual(s) who experienced the bias," "witnessed the bias," were a "viewer" of the bias who "observed [it] online," or merely have a "bias concern without being directly impacted." Complainants must also specify whether the "the Police [were] involved."

43.     The University has created "the Bias Response Team" and charged it with responding to bias incidents. This "team of trained professionals" is managed by a senior administrator (Assistant Dean Harris on the Bloomington Campus and Vice Chancellor Betts on the Indianapolis Campus) hired by the University "to specifically address bias reports as [their] full-time job." The University's "bias response officials" take "every report they receive seriously" and "typically" respond within "1-2 business days." After receiving a complaint, they initiate "the Bias Incident Process," which includes "contact[ing] the involved parties" when possible, "collect[ing] information" about the incident, and "discuss[ing] next steps" with the offender and the complainant.

44.    According to Dean Harris, he "[i]deally" tries "to match up the people involved so they can resolve what happened between them." The University describes this step as "[m]ediation and facilitated dialogue." In some cases, however, the complainant asks Harris "to meet with the offending person to offer some educational insights" about their allegedly problematic speech and "improve how they interact and connect with other students." In other cases, Harris or another member of the Bias Response Team will "[r]efer [the complainant] to appropriate campus office that can effectively respond." The Bias Response Team advises complainants that, although its "primary goal is to provide support to the individual or community impacted" by a bias incident, all "reports will be evaluated to determine if further investigation is required for potential violations of university policy and/or criminal law." Finally, the Bias Response Team will "[l]og all reported incidents" and keep detailed records of the allegations against the offender, ostensibly so it can "track for trends" and "notify campus leaders of ongoing bias incidents."

## IV.    The Effect of the University's Policies on Speech First's Members

45.    Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech covered by the University's bias incidents policy, but they credibly fear that the expression of their deeply held views will be considered "biased," "marginaliz[ing]," "demean[ing]," "intimidating," and the like.

46.    One Speech First member, Student A, is a rising senior at the University.

47.    Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

48. Student A believes that someone's sex is determined at conception and cannot be changed, and that every person is either male or female. He thinks gender dysphoria exists, but it is a psychological condition that usually occurs in adolescents and is historically very rare. Student A does not believe that "gender identity" is an inherent trait that is separable from sex, and he thinks the fact that someone says they feel like a man or a woman (or neither) doesn't make that true. Student A views the increasingly common stories about adolescents regretting their "gender transitions" after reaching adulthood as clear evidence that most children who identify as transgender or "non-binary" are confused and should receive counseling instead of surgical interventions. When gender identity topics arise in class or in other discussions on campus, Student A wants to highlight this evidence and share his beliefs.

49. Student A has no ill will against members of the LGBT community and tries to treat everyone he encounters with dignity and respect, but he believes that homosexuality is immoral, and that marriage is between a man and a woman. He likewise believes that children do best when they are raised in a nuclear family with a mother and a father. For these reasons, Student A does not think that surrogacy arrangements between two men and a "surrogate parent" should be celebrated or promoted the way they frequently are in mainstream discourse. Student A believes these agreements deprive babies of their mothers and exploit women in difficult financial circumstances, and they have no place in a moral society.

50. Student A is strenuously opposed to illegal immigration and does not think people who are here illegally should be eligible for in-state tuition or to enroll at American universities at all. He thinks the sensitive public discourse around illegal immigration, where people

use euphemisms like "undocumented immigrant" instead of accurate words like "illegal," is absurd and inhibits the frank conversations necessary to address the border crisis.

51.     Student A believes that urban crime rates that disproportionately involve African American males are not evidence of systemic racism but of harmful cultural trends like single-parent households and failing schools. He thinks the real problem in our criminal justice system over the past decade has not been overenforcement of the law, but underenforcement.

52.     Student A enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

53.     Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

54.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including gender identity, marriage and family, immigration, or crime, Student A wants to point out the flaws in their arguments and convince them to change their minds.

55.     Student A wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly about these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

56.     Student A speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for sharing his beliefs.

57.     But the University's bias incidents policy makes him reluctant to openly express his opinions or have these conversations in the broader University community.

58.     Student A does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student A is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student A is afraid that the Bias Response Team will keep a record on him, share the allegations with campus leaders and others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

59.     Another Speech First member, Student B, is a rising senior at the University.

60.     Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

61.     Student B believes that the federal government needs to vigorously enforce our immigration laws, particularly at the southern border. He thinks that many of the illegal immigrants who are coming across the border do not have legitimate asylum claims and aren't really "refugees." They are economic migrants who are taking jobs and public resources away from taxpaying Americans who need them.

62.     Student B supports the State of Israel and believes that they have the right to forcefully defend themselves against terrorist attacks like the one on October 7, 2023. Student B thinks that most protestors who align themselves with the Palestinian cause and condemn Israel either tolerate antisemitism or are antisemitic themselves.

63.     Student B is strongly opposed to affirmative action and thinks that outcomes should be determined by merit rather than skin color. He believes that, if affirmative action were used to benefit white individuals instead of racial minorities, then everyone would identify it as the racist system that it is. Student B likewise believes that the concept of "racial equity," as opposed to equal opportunity, is fundamentally un-American.

64.     Student B enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

65.     Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

66.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including immigration, the Israel-Palestine conflict, or affirmative action, Student B wants to point out the flaws in their arguments and convince them to change their minds.

67.     Student B wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that many of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

68.     Student B speaks about these issues in small circles of friends when he knows that they share his opinions and are unlikely to report him for sharing his beliefs.

69.     The University's bias incidents policy, however, makes him reluctant to openly express his opinions or have these conversations in the broader University community.

70.     Student B does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student B is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student B is afraid that the Bias Response Team will keep a record on him, share the allegations with campus leaders and others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

71.     A third Speech First member, Student C, is a rising sophomore at the University.

72.     Student C is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

73.     Student C believes that abortion is a grave evil that should be illegal at all stages of pregnancy. Mothers and fathers should not be allowed to "choose" whether an innocent baby should live or die simply because its existence is inconvenient. Student C believes that abortion harms women in addition to infants, and he wants to point out that organizations like Planned Parenthood especially target women in low-income and majority-minority neighborhoods.

74.     Student C believes that the Diversity, Equity, and Inclusion movement is fundamentally racist and harmful to society. He believes that giving favorable treatment to racial minorities solely because of their skin color is just as wrong as giving it to white people because

of theirs. Student C thinks college students in 2024 are not responsible for slavery in the 1800s or segregation in the Jim Crow era, and that they should not be punished to atone for the failings of previous generations.

75.     Student C believes that sex is determined by biology, not someone's internal sense of "maleness" or "femaleness." He believes that men and women have significant physiological differences that do not disappear just because someone changes how they identify themselves. For this reason, Student C believes that biological males who identify as transgender or non-binary should not be allowed to compete in women's sports. Student C believes these men are simply taking opportunities away from actual women, depriving them of the joys of fair competition, and in many cases harming them psychologically by using the same locker rooms as them.

76.     Student C enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

77.     Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

78.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including abortion, the DEI movement, or gender identity, Student C wants to point out the flaws in their arguments and convince them to change their minds.

79.     Student C wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that some of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

80.     Student C frequently discusses these issues with small circles of classmates who he knows share his views, and also in certain circumstances when he knows a classmate is unlikely to report him for sharing his beliefs.

81.     The University's bias incidents policy, however, makes him reluctant to openly express his opinions or have these conversations in the broader University community.

82.     Student C does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student C is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student C is afraid that the Bias Response Team will keep a record on him, share the allegations with campus leaders and others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

83.     A fourth Speech First member, Student D, is a rising sophomore at the University.

84.     Student D is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

85.     Student D believes that DEI is a racist ideology that divides Americans and exacerbates racial tensions rather than healing them. He believes the idea that some individuals are "oppressors" and others are "oppressed" by virtue of their race and sex is infantilizing and reduces people to stereotypes. Student D thinks the notion of "white privilege" ignores the fact that white people, like people of every other race, have a wide variety of backgrounds and life circumstances—many of which are the opposite of privileged. Student D believes that, by treating individuals based on the color of their skin rather than the content of their character, DEI proponents are engaging in the same race-reductionism practiced by segregationists in previous generations.

86.     Student D believes that abortion is barbaric and that those who promote it are enabling the murder of the most vulnerable members of our society. He thinks most of the men who describe themselves as "pro-choice" are just trying to avoid taking any responsibility for the children they bring into the world.

87.     Student D believes that gender-identity theory is divorced from reality and that people are either male or female. He thinks the social movement to "accept" and "affirm" transgender, "non-binary," or other "gender-nonconforming identifies" is destructive and places women at risk.

88.     Student D also believes that unchecked illegal immigration increases crime and steals jobs and social services from Americans who need them. Student D thinks that providing public benefits to people who are here illegally only incentivizes others to break our laws and come here too. He likewise believes that many of the South and Central American

countries that are turning a blind eye towards the hundreds of thousands of people heading toward our southern border are willingly exporting problematic elements of their own societies.

89.    Student D enrolled in the University because he wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

90.    Student D wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

91.    When another classmate or member of the university community voices contrary views about these and other controversial topics, including race, abortion, sex, gender, or immigration, Student D wants to point out the flaws in their arguments and convince them to change their minds.

92.    Student D wants to speak directly to his classmates about these topics, and he wants to talk frequently and repeatedly on these issues. Given his views, he knows that some of these conversations will be heated and passionate. But he wants to have these conversations because he feels strongly about these issues.

93.    Student D frequently discusses these issues with small circles of classmates who he knows share his views, and also in certain circumstances when he knows a classmate is unlikely to report him for sharing his beliefs.

94.    The University's bias incidents policy, however, makes him reluctant to openly express his opinions or have these conversations in the broader University community.

95.     Student D does not fully express himself or talk about certain issues because he knows that students, faculty, or others will likely report him to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student D is confident that someone will find his speech to be "biased." He worries that there are other students who will "catch" him engaging in "biased" speech and that the University will take action against him. For example, Student D is afraid that the Bias Response Team will keep a record on him, share the allegations with campus leaders and others within the university, call him in for meetings, or refer the allegations to the Office of Student Conduct.

96.     A fifth Speech First member, Student E, is a rising sophomore at the University.

97.     Student E is politically conservative and holds political beliefs that are unpopular, controversial, and in the minority on campus.

98.     Student E believes that sex is determined by biology, cannot be changed, and does not exist on a "spectrum." As a woman, she thinks it's ridiculous and offensive when biological males claim to be female and insist that other students refer to them as "she" or "her." She has no desire to be rude or hurtful to others, but she does not want to be forced to use "preferred pronouns" that conflict with reality—and her Christian beliefs—simply because someone believes "their truth" is that they are a woman. When Student E hears classmates assert that "a woman is anyone who identifies as one" or that "trans women are women," she wants to respond with her belief that biological sex is binary.

99.     Student E likewise believes that allowing biological males who identify as transgender women to access women's bathrooms or locker rooms and to compete in women's sports threatens the privacy and safety of women and young girls. She believes that

men and women have innate physiological differences, and anyone who pretends those differences do not exist is prioritizing political correctness over common sense.

100.     Student E thinks the Black Lives Matter movement unnecessarily divides Americans and stokes racial resentment. She believes that every life has dignity and that Black Lives Matter activists' objection to the phrase "all lives matter" implies that they believe that some lives are more important than others.

101.     Student E enrolled in the University because she wants to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

102.     Student E wants to engage in open and robust intellectual debate with her fellow students about these topics in the classroom, in other areas of campus, online, and in the broader community.

103.     When another classmate or member of the university community voices contrary views about these and other controversial topics, including sex, gender, and race, Student E wants to point out the flaws in their arguments and convince them to change their minds.

104.     Student E wants to speak directly to her classmates about these topics, and she wants to talk frequently and repeatedly on these issues. Given her views, she knows that many people will have strong opposing views. But she wants to have these conversations because he feels strongly about these issues.

105.     Student E frequently discusses these issues with small circles of classmates who she knows share her views, and also in certain circumstances when she knows a classmate is unlikely to report her for sharing her beliefs.

106. The University's bias incidents policy, however, makes her reluctant to openly express her opinions or have these conversations in the broader University community.

107. Student E does not fully express herself or talk about certain issues because she knows that students, faculty, or others will likely report her to University officials for committing a "bias" incident. Because the definition of "bias" is so broad and vague, Student E is confident that someone will find her speech to be "biased." She worries that there are other students who will "catch" her engaging in "biased" speech and that the University will take action against her. For example, Student E is afraid that the Bias Response Team will keep a record on her, share the allegations with campus leaders and others within the university, call her in for meetings, or refer the allegations to the Office of Student Conduct.

### COUNT I
### Violation of the First Amendment
### (Bias Incidents Policy)

108. Plaintiff repeats and realleges each of the prior allegations in this complaint.

109. The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

110. The bias incidents policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

111. The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

112. The University openly acknowledges that students can face disciplinary sanctions for committing "bias incidents," which renders the policy unconstitutional on its own.

Otherwise, the University would not specify that "reports will be evaluated to determine if further investigation is required for potential violations of university policy," promise to "refer" complaints "to appropriate campus offices that can effectively respond," or emphasize that the policy applies to speech based on protected characteristics "identified in the student code of conduct." But even when students cannot be formally disciplined, the bias-incident protocol objectively chills speech by "log[ging] all reported incidents and track[ing] for trends," threatening students with negative consequences, and subjecting them to burdensome administrative processes. *See Schlissel*, 939 F.3d 756; *Fenves*, 979 F.3d 319; *Cartwright*, 32 F.4th at 1123.

113.    This overbroad policy chills protected speech and expression.

114.    Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Bias Incidents Policy)

115.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

116.    The bias incidents policy gives students no guidance about what speech is permitted and what speech isn't, and the policy authorizes arbitrary and discriminatory enforcement.

117.    The policy defines "bias incident" as "any conduct, speech, or expression, motivated in whole or in part by bias or prejudice meant to intimidate, demean, mock, degrade, marginalize, or threaten individuals or groups based on that individual or group's actual or perceived identities." The policy does not define "bias" or any other operative term. And although the University characterizes bias incidents as distinct from punishable "harassment or

discrimination" under the Code of Conduct, it frequently conflates the two in public statements to the student body.

118.    The bias incidents policy encompasses speech and conduct on and off campus, including statements made on "social media" or while riding "public transportation."

119.    The policy turns on unpredictable assessments about whether student speech is "motivated in whole or in part by bias or prejudice" against a person or group's "actual or perceived identities." Those terms are undefined and subjective. They "beg for clarification." *Fenves*, 979 F.3d at 332.

120.    The policy's vague standard deprives students of "a reasonable opportunity to understand what conduct [the policy] prohibits." *Hill v. Colorado*, 530 U.S. 730, 732 (2002).

121.    The policy is also "susceptible to discriminatory or arbitrary enforcement." *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012).

122.    The bias incidents policy is thus void for vagueness.

123.    Defendants adopted this unconstitutional policy under color of state law.


**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.    A declaratory judgment that the University's bias incidents policy violates the First and Fourteenth Amendments;

B.    A permanent injunction barring Defendants from enforcing the University's bias incidents policy;

C.     A permanent injunction barring Defendants from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias incidents;

D.     A preliminary injunction granting the relief specified above during the pendency of this action;

E.     Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F.     All other relief that Plaintiff is entitled to.

Dated: May 29, 2024                    Respectfully submitted,

/s/ Zachary Kester                     /s/ Cameron T. Norris
Zachary Kester                         J. Michael Connolly (*pro hac vice* forthcoming)
CHARITABLE ALLIES                      Cameron T. Norris (application for admission
3500 Depauw Blvd., Suite 3090          pending)
Indianapolis, IN 46268                 James F. Hasson (*pro hac vice* forthcoming)
463-229-0240                           Thomas S. Vaseliou (*pro hac vice* forthcoming)
zkester@charitableallies.org           CONSOVOY MCCARTHY PLLC
                                       1600 Wilson Blvd., Suite 700
                                       Arlington, VA 22209
                                       (703) 243-9423
                                       mike@consovoymccarthy.com
                                       cam@consovoymccarthy.com
                                       james@consovoymccarthy.com
                                       tvaseliou@consovoymccarthy.com

**VERIFICATION**

I, Cherise Trump, declare as follows:

1.      I am the Executive Director of Speech First, Inc., the plaintiff in this case.

2.      I have reviewed this complaint.

3.      For the allegations within my personal knowledge, I believe them all to be true.

4.      For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, C, D, and E.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 29, 2024

_____
Cherise Trump, Executive Director of Speech First, Inc.